# EXHIBIT A



**SUPPLY AGREEMENT**

This Supply Agreement (the "<u>Agreement</u>") is entered into by and among Akzo Nobel Coatings Inc. ("<u>Akzo Nobel</u>") with offices at 5300 Oakbrook Parkway Building 200, Suite 230, Norcross, Georgia 30093, and Keystone Automotive Industries, Inc. ("<u>Distributor</u>") with offices at 500 West Madison Street, Suite 2800, Chicago, Illinois 60661 SK Auto Body Repair Inc. ("<u>Customer</u>") with offices at 2490 S Main Street Suite C, Kennesaw, Georgia 30144 to be effective the 14th April, 2017 ("<u>Effective Date</u>").

**WHEREAS,** the Customer and Akzo Nobel entered into a supply agreement effective 1 May 2017 (the "<u>2017 Supply Agreement</u>");

**WHEREAS,** the Customer received a pre-paid discount totaling $400,000 (the "<u>2017 May Advance</u>") pursuant to the 2017 Supply Agreement of which $400,000 (the "<u>unearned May 2017 Advance</u>") is unearned by the Customer as of the Effective Date of this Agreement;

**WHEREAS,** the Customer, Akzo Nobel and Distributor desire to enter into this Agreement which shall entirely supersede and replace the 2017 Supply Agreement and carry-over the unearned portion of the 2017 May Advance to this Agreement and

In consideration of the mutual covenants set forth in this Agreement, Akzo Nobel, Distributor and Customer hereby agree as follows:

1. <u>TERM OF AGREEMENT</u>.  The term of this Agreement shall begin on the Effective Date and continue until the later of April 30, 2022 or the date the Purchase Commitment is fully achieved (the "<u>Term</u>") unless earlier terminated pursuant to this Agreement.

2. <u>EXCLUSIVE SUPPLY OF PRODUCTS</u>.

   A. During the Term, Customer shall use exclusively Akzo Nobel **Lesonal** brand automotive Paint (as defined below).

   B. During the Term, Customer shall purchase from Distributor or a distributor designated by Akzo Nobel (in the event the Distributor is unwilling or unable to supply the Products to Customer as required in Section 2.A. above) (as its sole supplier) all of Customer's requirements for Paint and Allied Products (as defined below) used by Customer at all automotive collision repair and refinish facilities owned and/or operated by Customer.

   C. "Paint" shall mean all forms of paint, mixing agents, primers, fillers, topcoats and finishes for use in repainting and/or repairing automobile bodies. "Allied Products" shall mean all supplies required in standard automobile collision repair procedures. Collectively, Paint and Allied Products may be referred to as "Products" herein.

   D. For the additional facility located at 600 S. 94th Avenue, Tolleson, Arizona 85353, Customer agrees that it will purchase a minimum of $<u>90,000</u> per year of Paint ("<u>Annual Purchase Commitment</u>"). Further, over the entire Term, Customer agrees that it will purchase a minimum of $<u>985,104</u> of Paint (the "<u>Term Purchase Commitment</u>"). Collectively, the Term Purchase Commitment and the Annual Purchase Commitment shall be referred to herein as the "<u>Purchase Commitment</u>". The Purchase Commitments set forth in this Paragraph are calculated based upon gross purchases which shall mean the total sales to Customer during the applicable period before all credits, discounts, rebates, allowances, freight, bad debts, sales taxes and/or other similar taxes.

   E. For all previous locations from contract dated 1 May 2017, Customer agrees that it will purchase a minimum of $<u>880,680</u> per year of Paint ("<u>Annual Purchase Commitment</u>"). Further, over the entire Term, Customer agrees that it will purchase a minimum of $<u>5,559,396</u> of Paint (the "<u>Term Purchase Commitment</u>"). Collectively, the Term Purchase Commitment and the Annual Purchase Commitment shall be referred to herein as the "<u>Purchase Commitment</u>". The Purchase Commitments set forth in this Paragraph are calculated based upon gross purchases which shall mean the total sales to Customer during the applicable period before all credits, discounts, rebates, allowances, freight, bad debts, sales taxes and/or other similar taxes.

F. If Customer's annual purchases of Paint fall below the Annual Purchase Commitment set forth above on a cumulative basis, in addition to any other remedies that Akzo Nobel and/or Distributor may have under this Agreement, at law or in equity, Akzo Nobel and Distributor may elect, in their sole discretion to either (a) negotiate with Customer to bring product purchases current with the Annual Purchase Commitment within ninety (90) days; (b) reduce or remove any discounts; (c) invoice Customer for, and Customer shall pay to Akzo Nobel and Distributor, twenty-five percent (25%) of the difference between Customer's actual cumulative purchases and the cumulative Annual Purchase Commitment, such amount to be due and payable in full within thirty (30) days after the receipt by Customer of such invoice; or (d) allow the Agreement Term to be extended in order for Customer to fully satisfy the Purchase Commitment.

G. All purchases of Products from Distributor shall be in accordance with Distributor's then current pricing policy and terms and conditions of sale (as are set forth on the reverse side of Distributor's invoices), all of which shall supplement the terms and conditions set forth in this Agreement and are incorporated by reference herein; provided, however, if there is a conflict the provisions of this Agreement shall control.

3. PRICE. The price for Paint purchased by Customer shall be the list prices set forth on Akzo Nobel's Refinisher Price List less any discount agreed to in a separate writing between Distributor and Customer. The price for Allied Products and any purchase commitments relating to Allied Products or automotive parts purchases shall be agreed to in a separate writing between Distributor and Customer. Any and all taxes, governmental charges, excises, duties and or other similar charges which may now or hereafter be imposed by any Federal, State or local authority on the sale of Products hereunder are the sole responsibility of Customer and shall be in addition to the purchase price.

4. PAYMENT. Customer shall pay all invoices upon terms agreed to in a separate writing between Distributor and Customer. Further, Customer expressly acknowledges and agrees that Distributor shall have the right to withhold and deduct from any rebates, credits, incentives, discounts or other payments owed to Customer by Distributor pursuant to the terms of this Agreement or any other agreement or document any such amounts that are due and unpaid from Customer to Distributor. Further, Distributor will retain and offset any Distributor accounts payable balances due to Customer with Distributor accounts receivable balances due from Customer.

5. CUSTOMER INCENTIVES.

A. As of the Effective Date of this Agreement, the unearned portion of the 2017 May Advance equals Four Hundred Thousand Dollars ($400,000) (the "May 2017 Advance Carry-Over") of which $200,000 is due to Akzo Nobel and $200,000 is due to Distributor. In consideration of the Purchase Commitment set forth herein, Akzo Nobel and Distributor hereby agree to include the May 2017 Advance Carry-Over under this Agreement.

B. Akzo Nobel will advance to Customer a pre-paid discount totaling Thirty-Seven Thousand Five Hundred Dollars ($37,500) (the "Akzo Advance") in consideration of the Purchase Commitment set forth above. Distributor will advance to Customer a pre-paid discount totaling Thirty-Seven Thousand Five Hundred Dollars ($37,500) (the "Distributor Advance," together with the Akzo Advance, shall be referred to herein as the "Advance") in consideration of the Purchase Commitment set forth above. The Advance will be paid by Akzo Nobel, Distributor or both, at the discretion of Akzo Nobel and Distributor, in the form of a check within thirty (30) days after the execution of this Agreement by all parties set forth below; provided, however, a check will not be issued to Customer until the Customer signs and returns to Distributor and/or Akzo Nobel (as instructed) a completed W-9 form for the Customer. Customer shall use the Advance toward the purchase of equipment and other improvements for Customer's automobile repair and refinish facilities.

C. Akzo Nobel agrees to and will loan to Customer certain computer hardware, mixing equipment and other similar equipment (the "Loaned Equipment"). The Loaned Equipment shall at all times remain the property of Akzo Nobel and shall be returned by Customer immediately upon demand which may be made at any time in Akzo Nobel's discretion. All costs of shipping, installation and removal shall be paid by Customer. Customer will execute any and all appropriate documents and forms required by Akzo Nobel to protect Akzo Nobel's interest in the Loaned Equipment (i.e., equipment lease, loan agreement, etc.) and to reasonably ensure that the Loaned Equipment will be returned to Akzo Nobel in the condition it was delivered to Customer, reasonable wear and tear expected. Customer shall bear all risk of loss for the Loaned Equipment and all damage thereto, normal wear and tear expected, and agrees to and shall indemnify, defend, protect and hold Akzo Nobel free and harmless from and against any and all losses, damages, injuries, death and liabilities alleged by any person or entity to have resulted from Customer's use or Akzo Nobel's ownership of the Loaned Equipment. Customer agrees to and shall operate and maintain the Loaned Equipment in a safe condition. Customer agrees to and shall procure at its own cost and expense such policies of insurance, with amounts of stated liability and deductibles issued by such insurers, as Akzo Nobel approves in writing from time to time. Customer will insure all Loaned Equipment from fire, theft, flood, earthquake or other damage to the extent of the full replacement value thereof.

    D. Distributor may provide certain Paint on consignment to Customer (the "Consignment Inventory"). If Distributor and Customer agree to maintain certain amounts of Consignment Inventory, any such arrangement shall be subject to Customer's execution of Distributor's consignment agreement setting forth the applicable terms and conditions for such Consignment Inventory.

    E. In consideration for the issuance of the Advance, Customer hereby grants a security interest in and assigns to Akzo Nobel and Distributor the Collateral described below to secure repayment of the unearned Advance as set forth in Section 8.B. To secure payment and performance, Customer hereby grants to Akzo Nobel and Distributor a continuing security interest in all of Customer's presently owned or hereafter acquired (wherever located) (a) goods, (b) instruments, (c) promissory notes (d) Chattel paper including electronic chattel paper and tangible chattel paper, (e) documents, (f) books and records, (g) accounts, (h) accounts receivable, (i) equipment, (j) inventory, (k) commercial tort claims (l) general intangibles, (m) payment intangibles and (n) software, together with all proceeds and all support obligations thereof (collectively, "Collateral"). The Customer hereby irrevocably authorizes Akzo Nobel and Distributor at anytime and from time to time to file in any Uniform Commercial Code jurisdiction any initial or continuation financing statements and amendments thereto that indicate the Collateral and contain any other information required under Article 9 of the Uniform Commercial Code of the filing jurisdiction. Upon Customer's default of its obligation to repay the unearned Advance, in addition to any other remedies, Akzo Nobel and Distributor shall have all rights set forth under the Uniform Commercial Code, including, but not limited to Article 9, and may exercise its rights of enforcement under the Uniform Commercial Code in force in the State where the Collateral is located. Customer agrees to execute any further documents, and to take any further actions, reasonably requested by Akzo Nobel and/or Distributor to evidence or perfect the security interest granted herein or to effectuate the rights granted to Akzo Nobel and Distributor herein.

    F. Customer shall execute the appropriate security documents (including, without limitation, UCC-1 financing statements) and such consignment and equipment use agreements, in form and substance acceptable to Akzo Nobel and Distributor, as shall be requested by Akzo Nobel and/or Distributor from time to time to evidence the consignment of the Paint and right to use certain computer hardware and mixing equipment as described herein. Akzo Nobel and Distributor shall have the right to include a documentation fee (not to exceed ($150) on Customer's first invoice in connection with the filing of any UCC-1 financing statement.

6. WARRANTY; DISCLAIMER. Customer is entitled to participate in any warranty program offered by Akzo Nobel for which Customer qualifies. EXCEPT AS PROVIDED IN A WARRANTY PROGRAM REFERRED TO IN THE PRECEDING SENTENCE IN WHICH CUSTOMER IS PARTICIPATING, AKZO NOBEL SPECIFICALLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, OF ANY KIND WHETHER ORAL OR WRITTEN INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT.

Akzo Nobel's recommendations or instructions for use of the Products are not intended to suggest operations which would infringe any U.S. patents, and Akzo Nobel assumes no liability or responsibility for any such infringement. Akzo Nobel may, without liability to Customer of any kind, decline to continue deliveries of any Product, the manufacture, sale or use which, in Akzo Nobel's opinion, would infringe any patent now or hereafter issued. Customer shall hold Akzo Nobel harmless against any expense, judgment or loss, including attorney's fees, for infringement of any patents or trademarks or other third party property rights which result from Customer's use of the Product or Akzo Nobel's compliance with Customer's designs, specifications or instructions.

7. LIMITATION OF LIABILITY. EACH OF AKZO NOBEL'S AND DISTRIBUTOR'S LIABILITY BASED UPON ANY LEGAL THEORY INCLUDING WITHOUT LIMITATION, NEGLIGENCE, BREACH OF WARRANTY, BREACH OF CONTRACT, STRICT LIABILITY OR TORT, SHALL BE LIMITED TO DIRECT OUT OF POCKET COSTS AND EXPENSES PAID BY CUSTOMER FOR THE COST TO REPAIR OR REPLACE CUSTOMER'S PRODUCT, WHICHEVER IS LOWER. IN NO EVENT SHALL AKZO NOBEL'S AND DISTRIBUTOR'S TOTAL LIABILITY EXCEED THE ANNUAL NET SALES OF AKZO NOBEL'S PRODUCTS TO CUSTOMER AS MEASURED BY THE IMMEDIATELY PRECEDING TWELVE (12) MONTHS' SALES. IN NO EVENT SHALL EITHER AKZO NOBEL OR DISTRIBUTOR BE LIABLE FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL, EXEMPLARY, PUNITIVE, MULTIPLE OR CONTINGENT DAMAGES, COSTS OF LITIGATION (INCLUDING EXPERT OR ATTORNEY'S FEES) OR FOR OTHER SIMILAR LOSS, INCLUDING WITHOUT LIMITATION, LOST PROFITS, LOST PRODUCTION OR LOST BUSINESS OPPORTUNITY, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES.

8. TERMINATION.

    A. Any party may terminate this Agreement at any time prior to the end of the Term as follows: (i) by the non-breaching or non-defaulting party in the event that another party, having committed a breach of this Agreement or

defaulted in the performance of any obligation under this Agreement, shall fail to remedy the breach or default within ten (10) calendar days after receipt of a written notice of a breach or default and request for performance; notwithstanding the foregoing, if the breach or default cannot be remedied within such ten (10) calendar day period, such period shall be extended provided that the breaching or defaulting party commences to remedy it within the ten (10) calendar day period and thereafter diligently continues to take all reasonable steps to remedy the breach or default until it is remedied; or (ii) upon ninety (90) calendar days prior written notice to the other parties; or (iii) in the event that any party ceases to conduct business in the normal and ordinary course, becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits the appointment of a receiver for its business or assets or avails itself of, or becomes subject to, any federal or state bankruptcy proceeding or any other statute relating to insolvency or the protection of rights of creditors; or (iv) if the Customer sells or otherwise disposes of all or any portion of its business or assets; or (v) if the Customer sells or transfers more than fifty percent (50%) of its capital stock, membership interests or partnership interests; or (vi) if the Customer sells, transfers or ceases to own and/or operate any of the Facilities owned and/or operated by Customer on the Effective Date of this Agreement; or (vii) if Akzo Nobel or Distributor determines that Customer has for any reason purchased Paint and/or Products from any person or entity other than Distributor; or (viii) if the Customer for any reason ceases purchasing (or purchasing its requirements for) Paint and/or Products from Distributor or if Akzo Nobel or Distributor determines that the Customer for any reason is purchasing merely a de minimis amount of Paint and/or Products for the primary purpose of avoiding operation of this provision.

B. If this Agreement is terminated for any reason prior to the expiration of the Term, Customer shall immediately repay in full to Akzo Nobel and to Distributor the unearned 2017 Advance and May 2017 Advance Carry-Over. The unearned Advance is determined as follows: Until such time as Customer's aggregate gross **Lesonal** brand Paint purchases under this Agreement exceed 60% of the Term Purchase Commitment or Three Million Three Hundred Thirty-Five Thousand Six Hundred Thirty-Seven Dollars ($3,335,637) (the "Threshold Level"), the unearned 2017 Advance and May 2017 Advance Carry-Over will be one hundred percent (100%) of the Advance. After such date as Customer's aggregate gross **Lesonal** brand Paint purchases exceed the Threshold Level, the unearned Akzo Advance and unearned Distributor Advance will be a pro rata portion determined as follows: by subtracting the Customer's actual gross purchases of **Lesonal** brand Paint from the Effective Date through the date of termination from the Term Purchase Commitment and then dividing such difference (the numerator) by the Term Purchase Commitment (denominator) and that percent shall be the percentage of the Advance that must be immediately repaid to Akzo Nobel and Distributor.

C. If this Agreement is terminated for any reason, Customer shall immediately pay any and all amounts, in full, due to Akzo Nobel and Distributor pursuant to this Agreement and Customer's entitlement to any rebates and/or credits shall immediately terminate.

D. Upon termination of this Agreement, each party shall return to the other all papers, material and other properties of the other held by each for purposes of this Agreement and, without limiting the generality of the foregoing, Customer shall return all Loaned Equipment to Akzo Nobel. Unless otherwise specified in this Agreement, any termination of this Agreement shall be without prejudice to the rights accrued and remedies subsisting under this Agreement, or at law, as at the date of such termination.

9. GENERAL PROVISIONS.

   A. Should Customer participate in any outside buying groups or Co-ops offering a discount or rebate on Akzo Nobel Products, any discount received from such buying groups or Co-ops will reduce the discount provided by Akzo Nobel and Distributor pursuant to this Agreement.

   B. Akzo Nobel and Distributor shall have the right upon five (5) days notice to visit any offices or locations to physically inspect and review financial records to ensure that the funds are being utilized in accordance with the terms of this Agreement. Customer agrees to cooperate and make such records reasonably available to Akzo Nobel or Distributor, as applicable.

   C. Customer hereby grants Akzo Nobel the right to use Customer's name and the term "Approved Supplier" in conjunction with any of Akzo Nobel's promotional advertising.

   D. Customer represents and warrants to each of Akzo Nobel and Distributor that neither the execution of this agreement nor the performance of its terms by Customer does or will constitute a breach of any existing contract to which Customer is a party.

   E. Akzo Nobel, Distributor and the Customer agree to the following terms of confidentiality: (i) as used herein, the term "Confidential Information" means this Agreement and any technical or business information which, pursuant

to this Agreement, the disclosing party discloses to the receiving party in writing, or if disclosed orally or visually is identified and described in writing within thirty (30) days following such disclosure, and which is marked "Confidential Information"; provided, however, that "Confidential Information" shall not include information which is or becomes published or otherwise publicly available through no breach of this Agreement, or which is already known to the receiving party at the time of this disclosure by the disclosing party as evidenced in writing, or which the receiving party later lawfully learns from some source other than directly or indirectly from the disclosing party; (ii) the receiving party, for itself and on behalf of its officers, incorporates, employees, and agents, agrees to hold Confidential Information disclosed to it in strict confidence and not to disclose any part of it to others, exercising the same degree of care as receiving party takes in protecting its own trade secrets; (iii) the receiving party agrees not to use Confidential Information except in furtherance of the purpose of this Agreement; (iv) the provisions set forth in this Section shall continue with respect to any Confidential Information disclosed hereunder for a period of three (3) years from the date of termination of this Agreement; and (v) no right under any patent, trademark, copyright or any other intellectual property right is granted by this Agreement. These terms of confidentiality shall survive termination of this Agreement.

F. As an inducement to Akzo Nobel and Distributor to execute this Agreement, <u>Shannon Abernathy</u> ("<u>Guarantor</u>"), hereby irrevocably and unconditionally guarantees the prompt and complete payment and performance by Customer of all of Customer's obligations to Akzo Nobel and/or Distributor under this Agreement, now or hereafter owing ("<u>Obligations</u>"). This guaranty is a primary, absolute and unconditional obligation of Guarantor and is enforceable by each of Akzo Nobel and/or Distributor, as applicable, their successors and assigns, before or after proceeding against Customer, any other guarantor and/or any collateral securing the Obligations, and regardless of any insolvency, receivership or bankruptcy of the Customer or any other guarantor, or any discharge, reduction, extension or other modification of Customer's indebtedness and/or the Obligations.

Guarantor irrevocably waives any claim or defense to this guaranty based upon lack of consideration or any other defense provided by law and irrevocably waives presentment, demand, protest or other notice of any kind, including, without limitation, notice of acceptance of this guaranty and notice of any claim or demand upon Customer. The obligations of Guarantor under this guaranty are in addition to and shall not prejudice or be prejudiced by any other agreement, instrument, surety or guaranty (including any other agreement, instrument, surety or guaranty signed by Guarantor) which Akzo Nobel or Distributor may now or hereafter hold relative to any of the Obligations. Without notice to Guarantor, Akzo Nobel or Distributor may (i) extend the time for any payment and/or performance under the Obligations; or (ii) otherwise agree in any manner with Customer respecting the Obligations. This guaranty shall survive termination of this Agreement.

10. <u>MISCELLANEOUS</u>.

   A. <u>Notices</u>. All notices and other communications sent by either party to the other hereunder shall be in writing and shall be hand delivered, sent either by certified mail or registered mail, postage prepaid, or sent by overnight commercial carrier guaranteeing next business day delivery (such as UPS or Federal Express), and shall be addressed to the recipient at its address set forth above; provided, that either party may designate a new address for the giving of notices by giving the other party written notice thereof in the manner herein set forth, whereupon notices and other communications shall be sent to the replacement address most recently designated.

   B. <u>Dispute Resolution</u>. Any dispute arising out of or relating to this Agreement including the breach, termination or validity thereof shall be resolved pursuant to the following two step process: 1) negotiation by senior executives who have authority to settle the controversy (which such negotiation shall take place within thirty (30) days from the date of written notice requesting negotiation); and 2) binding arbitration conducted in accordance with the commercial rules and procedures of AAA Arbitration, with arbitration hearings to be held in Atlanta, Georgia. If the dispute cannot be resolved without arbitration, the arbitration shall be governed by the Federal Arbitration Act, 9 U.S. §§ 1-16 and judgment on the award may be entered by any court having jurisdiction thereof. All Arbitration awards are binding and non-appealable, except as otherwise provided in the United States Arbitration Act. The parties agree that the prevailing party herein shall be entitled to recover its costs, disbursements and reasonable attorney's fees from the non-prevailing party following the final award.

   C. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Georgia.

   D. <u>Force Majeure</u>. Akzo Nobel's and Distributor's performance shall be excused where it is prevented or delayed by war, an actual or threatened act of terrorism, strike, embargo, riot, power outage, explosion, machinery, breakdown, accident, inability to obtain labor or materials, government restrictions or regulations, fire, flood, earthquake, act of God, or other causes beyond its reasonable control.

E. **Successors and Assigns.** Neither party may assign this Agreement, or any right or duties hereunder, in whole or in part without the prior written consent of the other. Any such assignment in violation of this Section shall be void. Subject to the foregoing, this Agreement shall be binding upon, and inure to the benefit of the parties and their respective successors and permitted assigns.

F. **Waiver; Amendment.** Any failure of either party to enforce or require the strict performance of any of the provisions of the Agreement shall not constitute a waiver of such provision or of any breach of such provision, nor in any way affect the right of such party to enforce hereafter any provision of the Agreement. No waiver, alteration, amendment or modification of this Agreement shall be of any force or effect unless reduced to writing and signed by the parties hereto.

G. **Remedies Cumulative.** The rights and remedies provided in this Agreement and all other rights and remedies available to either party at law or in equity are, to the extent permitted by law, cumulative and not exclusive of any other right or remedy now or hereafter available at law or in equity. Neither asserting a right nor employing a remedy shall preclude the concurrent assertion of any other right or employment of any other remedy, nor shall the failure to assert any right or remedy constitute a waiver of that right or remedy.

H. **Entire Agreement; Integration.** This Agreement embodies the entire understanding of the parties with respect to the subject matter hereof and supersedes and cancels any prior, verbal or written, communications, brochures, offerings, commitments, agreements, representations or warranties relating to the subject matter hereof. The preprinted terms and conditions contained on any purchase order or other document submitted by Customer shall not apply to any purchase of Products. In the event that any provision of this Agreement shall be unlawful or unenforceable, such provision shall be deemed stricken from the Agreement, but the Agreement shall not otherwise be affected.

I. **Authority; Counterparts.** The persons signing below represent and warrant that they have the requisite authority to bind the entities on whose behalf they are signing. This Agreement may be executed in any one or more counterparts. Each counterpart shall constitute an original of this Agreement and all counterparts taken together shall constitute one and the same instrument.

All terms and conditions of this Agreement are subject to final approval by Akzo Nobel Coatings Inc. Automotive & Aerospace Coatings N.A. and shall not be binding upon Akzo Nobel until executed by two authorized representatives of Akzo Nobel.

**IN WITNESS WHEREOF,** the parties acknowledge and agree to these terms, having received from one another good, valuable and sufficient consideration for such agreement and have caused their duly authorized officers to execute this Agreement as of the Effective Date.

**Akzo Nobel Coatings Inc.**

By: _____ 7/25/2017
Name: Douglas A. Holmberg
Title: Director NA, SMU Vehicle Refinishes
Date: _____

**Akzo Nobel Coatings Inc.**

By: _____ 7/31/2017
Name: Helmut Piotrasch
Title: Controller NA, SMU Vehicle Refinishes

**Keystone Automotive Industries Inc.**

By: _____
Name: Jonathon B. Tipton
Title: PBE Area Sales Manager

**SK Auto Body Repair, Inc.**

By: _____
Name: Shannon Abernathy
Title: Owner

**Guarantor**

By: _____
Name: Shannon Abernathy
         Individually



**After printing this label**:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.